## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| TWIN RIVERS TECHNOLOGIES HOLDINGS, INC; and TWIN RIVERS TECHNOLOGIES MANUFACTURING CORPORATION, | ) ) ) ) |
| Defendants. | ) ) ) ) |

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

## INTRODUCTION

1.     This action is a citizen suit brought under Section 505(a) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA,"), 33 U.S.C. § 1365(a), and Section 304(a) of the Clean Air Act ("Clean Air Act" or "CAA"), 42 U.S.C. § 7604(a), to address Clean Water Act and Clean Air Act violations by Twin Rivers Technologies Holdings, Inc. and Twin Rivers Technologies Manufacturing Corporation (collectively, "Twin Rivers" or "Defendants").

2.     Twin Rivers is subject to a National Pollution Discharge Elimination System Permit 2010 Permit No. MA0004073 ("NPDES Permit"). Among other things, the NPDES Permit regulates discharges of stormwater and non-contact cooling wastewater by Twin Rivers.

3.     Twin Rivers has discharged, and continues to discharge, stormwater and non-contact cooling wastewater into the Weymouth Fore River and Town River Bay, both waters of the United States, in violation of the NPDES Permit by: 1) violating the NPDES Permit's numeric effluent limitation for temperature; 2) violating the NPDES Permit's numeric effluent limitation

1

for flow rate; 3) violating the NPDES Permit's numeric effluent limitation for oil and grease; 4) violating the Massachusetts' Surface Water Quality Standards; 5) violating the NPDES Permit's narrative effluent limitations; 6) violating the NPDES Permit's requirements to make necessary modifications to all Best Management Practices ("BMPs") and control measures in its Stormwater Pollution Prevention Plan ("SWPPP"); and 7) violating the NPDES Permit's requirement to monitor temperature.

4.     The Facility's discharge of pollutants into the Weymouth-Fore River and Town River Bay degrades the rivers' health and diminishes the use and enjoyment of the rivers by Conservation Law Foundation ("CLF") members.

5.     Pursuant to the Clean Air Act, Twin Rivers is subject to the 2012 Title V Operating Permit (the "Title V Permit"), the June 2015 Air Quality Plan Approval (the "June 2015 Plan Approval"), and the October 2015 Amended Air Quality Plan Approval (the "October 2015 Plan Approval," collectively, the "Plan Approvals"). Twin Rivers has repeatedly emitted air pollutants into the atmosphere in a manner that violates the terms of its Title V Permit and Plan Approvals in at least the following ways: 1) exceeding numeric emission limits for carbon monoxide ("CO"); 2) exceeding numeric emission limits for nitrogen oxides ("$NO_x$"); 3) exceeding numeric emission limits and operational requirements for volatile organic chemicals ("VOCs"); 4) failing their biennial emissions compliance testing; 5) causing or contributing to conditions of air pollution; and 6) failing to immediately take appropriate steps to abate nuisance conditions.

6.     The Facility's emissions of air pollutants negatively affect the health and lives of CLF members living, working, and recreating near the Facility by repeatedly exposing them to harmful air pollutants.

7.     Upon information and belief, Twin Rivers has not taken any actions sufficient to prevent future violations of the type alleged in this Complaint.

8.     Absent an appropriate order from this Court, Twin Rivers is likely to repeat its violations of the Clean Water Act and Clean Air Act as described below.

9.     CLF seeks declaratory judgment, injunctive relief, and civil penalties with respect to the Defendants' violations of the NPDES Permit, Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1344, and applicable regulations, as well as with respect to the Defendants' violations of the Title V Permit, Plan Approvals, Section 502(a) of the Clean Air Act, 42 U.S.C. § 7661(a), the Massachusetts State Implementation Plan, and applicable regulations.

10.     This action encompasses post-Complaint violations of the types alleged in the Complaint.

## JURISDICTION AND VENUE

11.     Plaintiff brings this civil suit under the citizen suit provision of Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and the citizen suit provision of Section 304 of the Clean Air Act, 42 U.S.C. § 7604.

12.     This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a); Section 304(a)(1) of the Clean Air Act, 42 U.S.C. § 7604(a); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); 28 U.S.C. §§ 2201 and 2202 (declaratory judgment); and 15 U.S.C. § 1116 (injunctive relief).

13.     On June 14, 2023, Plaintiff notified Twin Rivers and its agents of its intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements of

Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations located at 40 C.F.R. §§ 135.2, 135.3.

14.     On June 14, 2023, Plaintiff also notified Twin Rivers and its agents of its intention to file suit for violations of the Clean Air Act, in compliance with the statutory notice requirements of Section 304(b)(1)(A) of the Clean Air Act, 42 U.S.C. § 7604(b)(1)(A), and the corresponding regulations located at 40 C.F.R. §§ 54.2, 54.3.

15.     A true and accurate copy of Plaintiff's Notice Letter ("Notice Letter") is attached as Exhibit 1. The Notice Letter is incorporated by reference herein. Each Defendant received the Notice Letter. A copy of a return receipt is attached as Exhibit 2.

16.     Plaintiff also sent copies of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region 1, the Citizen Suit Coordinator, and the Massachusetts Department of Environmental Protection ("MassDEP").

17.     Each of the entities identified in the preceding paragraph received the Notice Letter. A copy of a return receipt is attached as Exhibit 3.

18.     More than sixty days have elapsed since Plaintiff mailed its Notice Letter, during which time neither EPA nor the Commonwealth of Massachusetts has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B); 42 U.S.C. § 7604(b)(1)(B).

19.     The Clean Water Act violations alleged in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to re-occur. The Defendants remain in violation of the Clean Water Act.

20.     The Clean Air Act violations alleged in the Notice Letter have been repeated and are reasonably likely to re-occur. The Defendants remain in violation of the Clean Air Act.

21.     Venue is proper in the United States District Court for the District of Massachusetts pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

22.     Venue is proper in the United States District Court for the District of Massachusetts pursuant to Section 304(c)(1) of the Clean Air Act, 42 U.S.C. § 7604(c)(1), because the sources of the violations are located within this judicial district.

## PARTIES

### Plaintiff

23.     Plaintiff, Conservation Law Foundation ("CLF"), is a nonprofit, member-supported, regional environmental advocacy organization dedicated to protecting New England's environment.

24.     CLF has a long history of working to protect the health of New England's water resources, including addressing sources of wastewater and industrial stormwater pollution.

25.     CLF has over 5,400 members in New England. CLF members live, work, recreate, and spend time near the Weymouth-Fore River and Town River Bay.

26.     CLF members use and enjoy the Weymouth-Fore River and Town River Bay downstream from the Twin Rivers Facility for recreational and aesthetic purposes.

27.     CLF members have been, and continue to be, directly and adversely affected by discharges from the Twin Rivers Facility that degrade water quality in the Weymouth-Fore River and Town River Bay, in violation of the Clean Water Act.

28.     CLF members are harmed by non-contact cooling wastewater effluent with excess oil and grease, flow rate, and temperature, which discharges to the Town River Bay from the Twin Rivers Facility, in violation of the Clean Water Act.

29.     CLF members are harmed by stormwater discharge of zinc, nitrogen, and other pollutants to the Weymouth-Fore River from the Twin Rivers Facility, in violation of the Clean Water Act.

30.     The Facility's wastewater and stormwater discharges impair the recreational and aesthetic uses of the Weymouth-Fore River and Town River Bay by harming fish, birds, and other wildlife, contributing to unpleasant scum, foam, and/or odor, increasing toxic pollution, and reducing the use and enjoyment of the waterbodies by CLF members.

31.     CLF also has a long history of working to safeguard the health and quality of life in New England communities facing the adverse effects of air pollution.

32.     CLF members live near, own property near, work near, and spend time recreating near the Twin Rivers Facility.

33.     The health, well-being, quality of life, and enjoyment of CLF members are harmed by the Defendants' repeated violations of their Title V Permit and Plan Approvals, including the Defendants' excess emissions of carbon monoxide, nitrogen oxide, and volatile organic compounds.

34.     Defendants' violations of their Title V Permit and Plan Approvals have deleterious impacts on public health and the environment in the areas where CLF members live, work, and recreate, including exposing CLF members to noxious odors, noise, and harmful air pollutants.

**<u>Defendants</u>**

35.     Defendant Twin Rivers Technologies Holdings, Inc. is a corporation incorporated under the laws of Delaware.

36.     Defendant Twin Rivers Technologies Manufacturing Corporation is a corporation incorporated under the laws of Massachusetts.

37. Twin Rivers Technologies Holdings, Inc. is the holding company of Twin Rivers Technologies Manufacturing Corporation.

38. Together, Twin Rivers Technologies Holdings, Inc. and Twin Rivers Technologies Manufacturing Corporation are the Defendant "Twin Rivers."

39. Defendant Twin Rivers owns and operates a fatty acid and glycerin manufacturing facility located at 780 Washington Street in Quincy, Massachusetts, 02169 (the "Facility").

40. Defendant Twin Rivers has owned and/or operated the Facility since at least 1994.

41. Defendant Twin Rivers is responsible for ensuring that the Facility operates in compliance with the Clean Water Act and the Clean Air Act.

42. Defendant Twin Rivers, and its agents and directors, are persons as defined by Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5), and as defined by Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

43. The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1972).

44. The Clean Water Act prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit applicable to that point source. 33 USC §§ 1311(a), 1342.

45. Under the Clean Water Act's implementing regulations, the "discharge of a pollutant" is defined as "[a]ny addition of any 'pollutant' or combination of 'pollutants' to 'waters of the United States' from any 'point source.'" 40 CFR § 122.2. *See also* 33 U.S.C. § 1362(12).

7

46.     A "pollutant" is any "solid waste," "chemical wastes, biological materials," "wrecked or discarded equipment, rock, sand," and "industrial . . . waste" discharged into water. 33 U.S.C. § 1362(6). *See also,* 40 CFR § 122.2.

47.     The Clean Water Act defines navigable waters as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" are defined by EPA regulations to include, *inter alia*, all tributaries to interstate waters. *See* 40 C.F.R. § 120.2(a).

48.     "Point source" is defined broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

49.     Section 402 of the Clean Water Act requires NPDES permits to be issued for wastewater and stormwater discharges. *See,* 33 U.S.C. §§ 1342(a)(1), 1342(p)(2), 1342(p)(3)(A), 1342(p)(4), 1342(p)(6).

50.     To discharge pollutants into waters of the United States lawfully, Section 402 requires industrial facilities to obtain coverage under a NPDES permit and comply with its terms. 33 U.S.C. § 1342.

**Citizen Enforcement Suits Under the Clean Water Act**

51.     The Clean Water Act authorizes citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation. . . or an order issued by the Administrator or State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

52.     An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents

which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

53.     Such enforcement action under Section 505(a)(1) of the Clean Water Act includes an action seeking remedies for unauthorized discharges under Section 301 of the Clean Water Act, 33 U.S.C. §1311, as well as for violations of a permit condition under Section 505(f), 33 U.S.C. § 1365(f).

54.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to the maximum amount allowed pursuant to Sections 309(d) and 505(a) of the Clean Water Act. 33 U.S.C. §§ 1319(d), 1365(a). *See also* 40 CFR §§ 19.1-19.4.

**The Clean Air Act**

55.     In 1970, Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

56.     Title V of the Clean Air Act requires operating permits to be issued to all major sources of air pollutants. 42 U.S.C. § 7661a(a).

57.     Subject to EPA approval and oversight, the Commonwealth of Massachusetts administers an Operating Permits Program under Title V of the Clean Air Act, 42 U.S.C. § 7661a-7661f.

58.     EPA approved Massachusetts' Operating Permits Program effective May 15, 1996. 40 C.F.R. § 70.

59.     The Massachusetts Department of Environmental Protection administers the Operating Permits Program and issues Title V permits for facilities located in the Commonwealth.

60.     Section 107(a) of the Clean Air Act requires each state to submit State Implementation Plans to EPA in order to "assur[e] air quality within the entire geographic area comprising such State." 33 U.S.C § 7407(a).

61.     These state implementation plans "specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State." 33 U.S.C § 7407(a).

62.     The Commonwealth of Massachusetts has adopted a State Implementation Plan, which has been approved by the Environmental Protection Agency under Section 110 of the Clean Air Act.

63.     The Massachusetts State Implementation Plan includes the regulation at 310 CMR § 7.02, which requires a plan approval "prior to any construction, substantial reconstruction, alteration, or subsequent operation of a facility or emission unit that may emit air contaminants to the ambient air." 310 CMR 7.02(1)(b).

64.     Pursuant to 310 CMR 7.02(3)(f), "no person shall operate a facility approved under 310 CMR 7.02, except in compliance with any plan approval issued to the facility." 310 CMR 7.02(3)(f).

65.     Pursuant to 310 CMR 7.02, "a plan approval does not reduce or negate the responsibility of the facility owner or operator to comply with any other applicable requirements of the Department." *Id.*

66.     Any violation of the terms and conditions of a Title V Permit is a violation of the federal Clean Air Act. 42 U.S.C. § 7661a(a).

67.     Any violation of the terms and conditions of a Plan Approval is a violation of the Massachusetts State Implementation Plan and the Clean Air Act. 42 U.S.C. § 7604(f)(4).

**Citizen Enforcement Suits Under the Clean Air Act**

68.     In the "citizen suit" provision of the Clean Air Act, Congress authorizes "any person" to "commence a civil action… against any person… who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of… an emission standard or limitation under" the Act. 42 U.S.C. § 7604(a)(1).

69.     The Clean Air Act definition of "emission standard or limitation" includes, *inter alia:* "any other standard, limitation or schedule established under any permit issued pursuant to subchapter V [Title V] or under any applicable State implementation plan approved by the administrator, any permit term or condition, and any requirement to obtain a permit as a condition operations; which is in effect under this chapter … or under an applicable implementation plan." 42 U.S.C. § 7604(f)(4).

70.     The Clean Air Act citizen suit provision provides district courts with jurisdiction to "enforce" emission standards and limitations, and to impose an appropriate civil penalty on the violator of those emission standards and limitations. 42 U.S.C. § 7604.

## FACTUAL BACKGROUND

**The Facility's NPDES Permit**

71.     The Facility discharges untreated non-contact cooling wastewater (NCCW) from a "once-through" seawater cooling water system through Outfall Serial Number 003 to the Town River Bay. NPDES Permit Fact Sheet, §§ VI(B), VII(B)(3)(c).

72.     The Facility discharges untreated stormwater from the southern section of the Facility through Outfall Serial Number 001 to the Weymouth-Fore River. NPDES Permit at I.A.1; Permit Fact Sheet, §§ VI(A), VI(C)(1).

73.     On February 12, 2010, EPA issued the Facility's NPDES Permit No. MA0004073 for its non-contact cooling wastewater and untreated stormwater discharges. The Facility was required to comply with the requirements of the Permit from at least May 1, 2010. NPDES Permit at 1.

74.     Pursuant to 40 CFR § 122.6, the Permit has been administratively continued, and remains fully effective and enforceable.

### *The Facility's Monitoring and Reporting Requirements Under the NPDES Permit*

75.     Twin Rivers is required to submit discharge monitoring reports ("DMRs") to EPA by the 15th day of each month. NPDES Permit at I.G. The DMRs are required to summarize the monitoring results obtained during each calendar month, including any effluent limitation exceedances.

### *The Facility's Numeric Effluent Limitations for NCCW Discharges Under the NPDES Permit*

76.     The NPDES Permit places limits on the quantity and concentration of pollutants that the Facility is legally permitted to discharge into the Town River Bay through Outfall 003 by setting wastewater effluent limitations for flow rate and temperature. NPDES Permit at I.A.2.

77.     The NPDES Permit requires that the effluent discharged from the Facility not exceed a maximum daily flow rate of 5.0 million gallons per day (MGD). NPDES Permit at I.A(2).

78.     The NPDES Permit requires that the effluent discharged from the Facility not exceed a maximum daily temperature of 87 degrees Fahrenheit. NPDES Permit at I.A(2).

### *The Facility's Numeric Effluent Limitations for Stormwater Discharges Under the NPDES Permit*

79.     The Facility discharges stormwater associated with industrial activity. Permit Fact Sheet § VI(A).

80.     The Facility's activities include the manufacture of fatty acids and crude glycerin for surfactant and rubber industries. Permit Fact Sheet at § I.

12

81.    The NPDES Permit places limits on the quantity and concentration of pollutants from untreated stormwater that the Facility is legally permitted to discharge into the Town River Bay through Outfall 001 by setting effluent limitations for oil and grease. NPDES Permit at I.A(1).

82.    The NPDES Permit requires that the oil and grease effluent discharged from the Facility not exceed a maximum daily discharge of 15 mg/l in accordance with 40 CFR § 122.44(1) and Massachusetts Surface Water Quality Standards, 40 CMR 4.05(3)(b)(7). NPDES Permit at I.A(1); Permit Fact Sheet at § VI(D)(5).

### *The Facility's State Surface Water Quality Standards Requirements Under the NPDES Permit*

83.    The NPDES Permit requires that "discharges either individually or in combination shall not cause a violation of State Water Quality Standards of the receiving waters…." NPDES Permit at I.A(3)(a).

84.    Massachusetts' state surface water quality standards require that for all surface waters, "existing uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 314 CMR 4.04(1).

85.    Massachusetts' state surface water quality standards require that all surface waters shall:

   a.    "[B]e free from pollutants in concentrations or combinations that settle to form objectionable deposits; float as debris, scum or other matter to form nuisances; produce objectionable odor, color, taste or turbidity; or produce undesirable or nuisance species of aquatic life." 314 CMR 4.05(5)(a);

   b.    "[B]e free from pollutants in concentrations or combinations or from alterations that adversely affect the physical or chemical nature of the bottom, interfere with the propagation of fish or shellfish, or adversely affect populations of non-mobile or sessile benthic organisms." 314 CMR 4.05(5)(b);

c. "[B]e free from nutrients in concentrations that would cause or contribute to impairment of existing or designated uses," unless naturally occurring. 314 CMR 4.05(5)(c); and

d. "[B]e free from pollutants in concentrations or combinations that are toxic to humans, aquatic life or wildlife. 314 CMR 4.05(5)(e).

86. Massachusetts' state surface water quality standards require that Class SB waters, including the Town River Bay and Weymouth-Fore River, shall:

a. "Not exceed [a temperature of] 85ºF (29.4ºC) nor a maximum daily mean [temperature] of 80ºF (26.7ºC), and the rise in temperature due to a discharge shall not exceed 1.5ºF (0.8ºC) during the summer months (July through September) nor 4ºF (2.2ºC) during the winter months (October through June)." 314 CMR 4.05(4)(b)(2);

b. "[B]e free from floating, suspended and settleable solids in concentrations and combinations that would impair any use assigned to this class, that would cause aesthetically objectionable conditions, or that would impair the benthic biota or degrade the chemical composition of the bottom." 314 CMR 4.05(4)(b)(5);

c. "[B]e free from color and turbidity in concentrations or combinations that are aesthetically objectionable or would impair any use assigned to this class." 314 CMR 4.05(4)(b)(6); and

d. "[B]e free from oil, grease and petrochemicals that produce a visible film on the surface of the water, impart an oily taste to the water or an oily or other undesirable taste to the edible portions of aquatic life, coat the banks or bottom of the water course, or are deleterious or become toxic to aquatic life." 314 CMR 4.05(4)(b)(7).

14

### *The Facility's Narrative Limitations Under the NPDES Permit*

87.     The NPDES Permit requires that the Facility's discharges "shall not lower the quality of any classified body of water below such classification, or lower the existing quality of any body of water if the existing quality is higher than the classification." NPDES Permit at I.A.3.h.

88.     The NPDES Permit requires that the Facility's discharges "shall not cause an objectionable discoloration of the receiving waters." NPDES Permit at I.A.3.c.

89.     The NPDES Permit requires that the Facility's effluent "shall contain neither visible oil sheen, foam, nor floating solids at any time." NPDES Permit at 1.A(3)(d).

90.     The NPDES Permit requires that the Facility's discharges "shall not contain materials in concentrations or combinations which are hazardous or toxic to human health, aquatic life of the receiving waters or which would impair the uses designated by its classification." NPDES Permit at I.A.3.e.

91.     The NPDES Permit requires that the Facility's wastewater discharge "not impart color, taste, turbidity, toxicity, radioactivity or other properties which cause those waters to be unsuitable for the designated uses and characteristics ascribed to their use." NPDES Permit at I.A.3.f.

### *The Facility's Best Management Practices and Stormwater Control Measures Requirements Under the NPDES Permit*

92.     The NPDES Permit requires Twin Rivers to "develop, implement and maintain a Stormwater Pollution Prevention Plan ("SWPPP") designed to reduce, or prevent, the discharge of pollutants in stormwater to the receiving waters." NPDES Permit at I.B.1.

93.     The NPDES Permit requires that the SWPPP be consistent with permit requirements, and "shall serve as a tool to document the permittee's compliance with the terms of this permit." *Id.*

15

94.     The NPDES Permit requires that the SWPPP shall document the selection, design, and installation of control measures, and shall contain: a pollution prevention team; a site description; a summary of all pollutant sources; a description of all stormwater controls; and a schedule and procedure for implementation and maintenance of control measures, quarterly inspections, and best management practices ("BMPs"). NPDES Permit at I.B.3.a-e.

95.     The NPDES Permit requires that the SWPPP "shall document the appropriate BMPs implemented or to be implemented at the facility to minimize the discharge of pollutants in stormwater to the waters of the United States." NPDES Permit at I.B.4.

96.     The NPDES Permit requires that Twin Rivers minimize "exposure of manufacturing, processing, and material storage areas to stormwater discharges." NPDES Permit at I.B.4.a.

97.     The NPDES Permit requires that Twin Rivers provide "[g]ood housekeeping measures designed to maintain areas that are potential sources of pollutants in stormwater discharged to receiving waters."  NPDES Permit at I.B.4.b.

98.     The NPDES Permit requires that the Facility's BMPs include preventative maintenance programs and spill response procedures to "avoid leaks, spills and other releases of pollutants in stormwater discharges" and "ensure effective responses to spills and leaks if or when they occur." NPDES Permit at I.B.4.c-d.

99.     The NPDES Permit requires Twin Rivers to conduct quarterly benchmark monitoring for zinc and nitrogen "primarily to determine the overall effectiveness of control measures." NPDES Permit at I.B.6.

100.     The NPDES Permit provides that the benchmark concentration for nitrogen is 0.68 mg/l, as identified in EPA's 2008 Storm Water Multi-Sector General Permit (MSGP) for Industrial Activities. NPDES Permit at I.A.1.n.5.

101.    The NPDES Permit provides that the benchmark concentration for Total Zinc is 0.095 mg/l, based on the National Recommended Water Quality Criteria.  NPDES Permit at I.A.1.n.6.

102.    The NPDES Permit provides that "if the average of four (4) monitoring values for a parameter in any calendar year exceeds the benchmark concentration, the permittee shall review the selection, design, installation, and implementation of all BMPs and control measures in the SWPPP, and make necessary modifications until the running four (4) quarter average for the parameter no longer exceeds the benchmark concentrations." NPDES Permit at I.B.6.b.

103.    The NPDES Permit requires Twin Rivers to "make necessary modifications immediately, without waiting for results from a full 4 quarters of monitoring data, if an exceedance of the 4 quarter average in any year is mathematically certain." *Id.*

104.    Twin Rivers is required to "document in the SWPPP any violation of numerical or non-numerical stormwater effluent limits with a date and description of the corrective actions taken." NPDES Permit at I.B.8.

### *The Facility's Temperature Monitoring Requirements Under the NPDES Permit*

105.    The NPDES Permit requires Twin Rivers to "collect temperature readings from the Town River Bay during seven consecutive days in March and seven consecutive days in August using an array of thermistors." NPDES Permit at I.E.1.

106.    Twin Rivers is required to equip thermistors with a data logging device to develop a continuous temperature data record and collect samples "during times that the facility is discharging from Outfall 003." NPDES Permit at I.E.2.

### The Facility's Air Permit and Plan Approvals

107.    Twin Rivers is a major source of oxides of nitrogen ($NO_x$) and sulfur dioxide ($SO_2$) emissions. Title V Permit, § 1.

108.    The Facility emits carbon monoxide into the atmosphere. Title V Permit, § 1.

109.    The Facility emits volatile organic compounds (VOCs) into the atmosphere. Title V Permit, § 1.

110.    MassDEP issued Twin Rivers Permit No. MA0000002511900497 pursuant to Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f.

111.    The Title V Permit became effective on or around September 27, 2012, and it expired on October 21, 2016.

112.    Pursuant to 310 CMR 7.00, Appendix C(11)(e), the Permit has been administratively continued, and remains fully effective and enforceable.

113.    The Facility's operations are also governed by two Comprehensive Plan Approvals issued pursuant to 310 CMR 7.02 ("Plan Approvals").

114.    The June 2015 Plan Approval was granted by MassDEP on June 10, 2015.

115.    The June 2015 Plan Approval allowed for the replacement of a wet scrubber (PCD1) with a high efficiency regenerative thermal oxidizer (RTO-PCD1) at the Facility.

116.    The October 2015 Plan Approval was granted by MassDEP on October 1, 2015.

117.    The October 2015 Plan Approval allowed for the addition of Emissions Unit 5 ("EU5") and Emissions Unit 6 ("EU6") at the Facility.

### The Facility's Monitoring and Reporting Requirements Under the Title V Permit

118.    The Title V Permit requires that Defendants submit annual compliance reports that certify, annually for the calendar year, that the Facility is in compliance with the requirements of the Title V Permit. Title V Permit, § 10.A.

119.    The annual compliance certification and report shall describe: 1) the terms and conditions of the Permit that are the basis of the certification; 2) the current compliance status and whether compliance was continuous or intermittent during the reporting period; 3) the methods used for

18

determining compliance, including a description of the monitoring, record keeping, and reporting requirements and test methods; and 4) any additional information required by the MassDEP to determine compliance status of the source. Title V Permit, § 10.A.

120.    The Title V Permit requires that Defendants submit semi-annual monitoring summary reports that certify the Facility's compliance with the requirements of the Title V Permit. Title V Permit, § 10.B.

121.    The semi-annual compliance certification and report shall describe: 1) the terms and conditions of the Permit that are the basis of the certification; 2) the current compliance status during the reporting period; 3) the methods used for determining compliance, including a description of the monitoring, record keeping, and reporting requirements and test methods; 4) whether there were any deviations during the reporting period; 5) if there are any outstanding deviations at the time of reporting, and the Corrective Action Plan to remedy said deviation; 6) whether deviations in the reporting period were previously reported; 7) if there are any outstanding deviations at the time of reporting, the proposed date of return to compliance; 8) if the deviations in the reporting period have returned to compliance and date of such return to compliance; and 9) any additional information required by the MassDEP to determine the compliance status of the source. *Id.*

122.    The Title V Permit Requires that Defendants report certain Permit deviations to MassDEP within three (3) days of discovery of such deviation, including the following: 1) unpermitted pollutant releases, excess emissions or opacity exceedances measured directly by CEMS/COMS, by EPA reference methods or by other credible evidence, which are ten percent (10%) or more above the emission limit; 2) exceedances of parameter limits established by the Permit or other approvals, where the parameter limit is identified by the Permit or approval as surrogate for an

19

emission limit; 3) exceedances of Permit operational limitations directly correlated to excess emissions; 4) failure to capture valid emissions or opacity monitoring data or to maintain monitoring equipment as required by statutes, regulations, the Permit, or other approvals; and 5) failure to perform QA/QC measures as required by the Permit or other approvals for instruments that directly monitor compliance. Title V Permit, § 25.

### *The Facility's Numeric Emission Limits and Operational Requirements Under the Title V Permit*

123.    The Title V Permit requires the Facility to limit emissions of VOCs to 0.12 pounds per hour from Pollution Control Device (PCD) 1. Title V Permit, § 4A.

124.    The Title V Permit requires that PCD1 provide an overall VOC control efficiency by weight of 94 percent. Title V Permit, § 4A.

125.    The Title V Permit requires the Facility to limit emissions of VOCs to 0.03 pounds per hour from Pollution Control Device (PCD) 2. Title V Permit, § 4A.

126.    The Title V Permit requires that PCD2 provide an overall VOC control efficiency by weight of 85 percent. Title V Permit, § 4A.

### *The Facility's Numeric Emission Limits and Operational Requirements Under the June 2015 Plan Approval*

127.    The June 2015 Plan Approval requires the Facility to limit emissions of VOCs to 0.15 pounds per hour for the emissions from Emissions Unit 4 ("EU4"). June 2015 Plan Approval, § 3A.

128.    The June 2015 Plan Approval requires that "RTO-PCD1 shall provide a minimum VOC destruction efficiency of 97 percent by weight or a maximum outlet VOC emission rate of 0.15 pounds per hour, whichever is less stringent." June 2015 Plan Approval, § 3A.

129.    The June 2015 Plan Approval requires the Facility to limit emissions of VOCs to 0.0046 pounds per hour for the emissions from PCD2/PCD2A. June 2015 Plan Approval, § 3A.

20

130.    The June 2015 Plan Approval requires that PCD2/PCD2A shall provide a minimum VOC control efficiency of 95 percent by weight. June 2015 Plan Approval, § 3A.

### The Facility's Numeric Emission Limits and Operational Requirements Under the October 2015 Plan Approval

131.    The October 2015 Plan Approval requires the Facility to limit emissions of CO to 0.32 pounds per hour for the combined emissions from EU5 and EU6. October 2015 Plan Approval, § 4A.

132.    The October 2015 Plan Approval requires the Facility to limit emissions of $NO_x$ to 0.54 pounds per hour for the combined emissions from EU5 and EU6. October 2015 Plan Approval, § 4A.

133.    The October 2015 Plan Approval requires the Facility to limit emissions of VOCs to 0.26 pounds per hour for the combined emissions from EU5 and EU6. October 2015 Plan Approval, § 4A.

### The Facility's Requirement to Perform Emissions Compliance Testing Under the Title V Permit

134.    The Title V Permit requires the Facility to perform emissions compliance testing on PCD1 and PCD2 biennially, using methods approved by MassDEP and the United States Environmental Protection Agency. Title V Permit, § 4B.

### The Facility's Requirement to Not Cause or Contribute to a Condition of Air Pollution Under the Title V Permit and Plan Approvals

135.    The Facility's Title V Permit requires that it operate the Facility "in such a manner as to prevent the occurrence of noise, dust, odor and/or visible emissions from the Facility which cause or contribute to a condition of air pollution." Title V Permit § 5, Special Condition 9.

136.    The Facility's June 2015 Plan Approval requires that it "shall install and use an exhaust stack . . . on RTO-PCD1 and re-use the existing stack on PCD2/PCD2A, that are consistent with

good air pollution control engineering practice and that discharges so as to not cause or contribute to a condition of air pollution." June 2015 Plan Approval § 4(B).

137.    The Facility's October 2015 Plan Approval requires that it "take necessary precautions to ensure that the Facility complies with MassDEP's noise regulation and that the Facility does not cause a condition of air pollution." October 2015 Plan Approval § 4(B)(1).

### *The Facility's Requirement to Immediately Take Appropriate Steps to Abate Nuisance Conditions Under the Title V Permit and Plan Approvals*

138.    The Title V Permit requires that Twin Rivers "take immediate steps to abate any nuisance conditions, including but not limited to noise, dust, odor and/or visible emissions, that may be generated by the operation of this facility." Title V Permit § 5, Special Condition 9.

139.    The Title V Permit requires Twin Rivers to immediately take steps to abate nuisance conditions "should any nuisance condition(s) be generated by the operation of the emission units." Title V Permit § 5, Special Condition 7.

140.     The June 2015 Plan Approval requires that "should any nuisance condition(s), including but not limited to smoke, dust, odor, or noise, occur as the result of the operation of the Facility, then the Permittee shall immediately take appropriate steps including shutdown, if necessary, to abate said nuisance condition(s)." June 2015 Plan Approval § 5(A).

141.    The October 2015 Plan Approval requires that "[s]hould any nuisance condition(s) be generated by the operation of the above-described equipment, then appropriate steps shall immediately be taken by [Twin Rivers] to abate said nuisance condition(s)." October 2015 Plan Approval § 6(1).

### **The Facility's Operations**

142.    Twin Rivers has operated and continues to operate a fatty acid and glycerin production facility at 780 Washington Street, Quincy, MA 02169.

143.     The Facility manufactures fatty acids and glycerin from animal fats and vegetable oil. Permit Fact Sheet at § VI(A); Title V Permit, § 1.

144.     The manufacturing process includes hydrolysis, a high temperature pressure process that separates the glycerin and fatty acids from both types of raw materials. Permit Fact Sheet at § VI(A).

### Non-Contact Cooling Water Discharges

145.     The Facility withdraws water from the Weymouth Fore River to use as a once-through NCCW for a hydrogenation process during manufacturing.  Permit Fact Sheet at § VI(B).

146.     The NCCW intake structure is comprised of two intake tunnels. Each tunnel is split into two pipes (for a total of four pipes), which merge into a single intake tunnel drawing water into the Facility. *Id.*

147.     Four existing pump intakes are located in the tunnels, each with a capacity of 10.6 million gallons per day (MGD) total. The Facility utilizes two of the pump intakes, for a total of approximately 5 MGD of cooling water. *Id.*

148.     The Facility discharges approximately 5 MGD of NCCW to the Town River Bay from Outfall 003. Permit Fact Sheet at § VI(C)(2).

149.     The NCCW is discharged to a tidal mudflat where it receives no dilution from the Town River Bay. *Id.*

### Stormwater Discharges

150.     The Facility's stormwater drainage system consists of catch basins that discharge to surface waters. Permit Fact Sheet at §§ VI(A), VI(C).

151.     The Facility has two separate stormwater catch basins: stormwater from the north section of the Facility is collected and ultimately discharged to the local publicly owned treatment works

("POTW"), and stormwater collected in the southern portion of the Facility is discharged through Outfall 001 into the Weymouth Fore River. Permit Fact Sheet at § VI(C)(1).

152.    The south section of the Facility is 246,000 square feet and contains "material storage, office space, a 3,000 gallon underground gasoline storage tank (with interstitial protection), part of the facility's industrial wastewater pretreatment system, a lift station, empty rail car storage tracks and chemical storage rooms." Permit Fact Sheet at § VI(C)(1).

153.    Upon information and belief, during every measurable precipitation event and every instance of snow melt, water flows onto and over exposed materials and accumulated pollutants at the Facility, generating stormwater runoff.

154.    EPA considers precipitation above 0.1 inches during a 24-hour period a measurable precipitation event. 40 C.F.R. § 122.26(c)(i)(E)(6).

155.    Twin Rivers has discharged, and continues to discharge, stormwater associated with industrial activities through Outfall 001.

156.    The Facility's NPDES Permit identifies the following potential pollutants in their stormwater runoff: oil and grease, total suspended solids, nitrogen, and zinc. NPDES Permit at 1.A.1.

157.    Upon information and belief, precipitation and stormwater collected on the south side of the Facility becomes contaminated with oil and grease, nitrogen, zinc, and other pollutants associated with the Facility and its operations.

158.    Upon information and belief, the south side of the Facility is exposed to precipitation or stormwater, necessitating the Facility's Storm Water Pollution Prevention Plan (SWPPP). Permit Fact Sheet at § VI(D)(8).

*Air Emissions*

159.    The Facility has reactors and distillation columns at EU4 and its air emissions are vented to two scrubbers described as PCD1 and PCD2, which are designed to control VOCs and odors from the Facility. Title V Permit, § 1.

160.    EU4 has a design capacity to process "350 million pounds of fatty acids and 80 million pounds of associated co-products per year." Title V Permit, § 2.

161.    Pursuant to the June 2015 Plan Approval, PCD1 was replaced with a regenerative thermal oxidizer described as RTO-PCD1. June 2015 Plan Approval, § 1.

162.    Pursuant to the June 2015 Plan Approval, Twin Rivers added a carbon absorption system to PCD2, designated as PCD2A. June 2015 Plan Approval, § 1.

163.    The Facility has a Combined Heat and Power cogeneration unit equipped with a combustion turbine described as EU5. October 2015 Plan Approval, § 1.

164.    The Facility has a heat recovery steam generating unit equipped with a natural gas fired duct burner described as EU6. October 2015 Plan Approval, § 1.

165.    Exhaust gases from EU5 and EU6 are emitted through an 80-foot-high stack with a maximum exit velocity of 89.6 feet per second. October 2015 Plan Approval, § 1.

166.    EU5 and EU6 combined emissions are controlled with "selective catalytic reduction" for $NO_x$ control, and an oxidation catalyst for CO and VOC control. October 2015 Plan Approval, § 1.

## Waterbodies Affected by the Facility's Wastewater and Stormwater Discharges

167.    Twin Rivers is located at the convergence of the Town River Bay and Weymouth Fore River in Quincy, MA. NPDES Permit Fact Sheet at III.

168.    The area immediately surrounding the Facility is a designated port area which is heavily used by recreational boat traffic. NPDES Permit Fact Sheet at III.

### *The Town River Bay*

169.    The Town River Bay is a Class SB waterbody pursuant to 314 CMR 4.05.

170.    The Town River Bay is a navigable water within the meaning of the Clean Water Act.

171.    The Town River Bay is a designated habitat for fish and other aquatic life and wildlife and for primary and secondary contact recreation.

172.    The Facility discharges NCCW to the Town River Bay at waterbody segment MA74-15. NPDES Permit Fact Sheet at § VI(C)(2).

173.    Waterbody segment MA74-15 was listed as impaired on the 2020, and 2022 303(d) lists for fish consumption from PCBs found in fish tissue, for fish and other aquatic life and wildlife due to dissolved oxygen, for primary contact recreation because of Enterococcus, and for shellfish harvesting due to fecal coliform.

### *The Weymouth Fore River*

174.    The Weymouth Fore River is a Class SB waterbody pursuant to 314 CMR 4.05.

175.    The Weymouth Fore River is a navigable water within the meaning of the Clean Water Act.

176.    The Weymouth Fore River is designated as a habitat for fish and other aquatic life and wildlife and for primary and secondary contact recreation.

177.    The Facility discharges stormwater to the Weymouth Fore River at waterbody segment MA74-14. NPDES Permit Fact Sheet at § VI(C)(1).

178.    Waterbody segment MA74-14 was listed as impaired on the 2020, and 2022 303(d) lists for fish consumption from PCBs found in fish tissue, for primary contact recreation because of Enterococcus, and for shellfish harvesting due to fecal coliform.

**Communities Affected by the Facility's Air Pollution Emissions**

179.    The Twin Rivers Facility is located in Quincy, Massachusetts.

180.    According to 2020 census data, 101,636 people live in the city of Quincy.

181.    According to 2020 Census data, Quincy is an environmental justice community in which 6.1% of residents are Black or African American, 4.6% of residents identify as Hispanic or Latino, and 10.8% of residents live below the poverty line.

182.    The Twin Rivers Facility is located within one mile of the city of Weymouth.

183.    According to 2020 census data, 57,743 people live in Weymouth, Massachusetts.

184.    According to 2020 Census data, Weymouth is an environmental justice community in which 4.6% of its population identifies as Black or African American and 4.6% identify as Hispanic or Latino.

185.    According to 2010 census data, 14,334 people live within one mile of the Facility.

186.    A Child's View Preschool is located within one half mile (0.5) of the Facility.

187.    Quincy Head Start, Snug Harbor Elementary School, and Clifford H. Marshall Elementary School are located within one mile of the Facility.

188.    Saint Joseph Parish is located within one half mile (0.5) of the Facility.

189.    The Quincy Point Congregational Church, the Greater Boston Chinese Seventh-day Adventist Church, and the Islamic Center of New England are located within one mile of the Facility.

190.    Avalon Beach is located within one half (0.5) mile of the Facility.

27

191.    Bicknell Street Cricket Ground, Jean Kennedy Playground, Taffrail Road Playground, Ward II Community Center, Fore River Field, and Kings Cove Park are located within one mile of the Facility.

## THE FACILITY'S VIOLATIONS OF THE CLEAN WATER ACT

### The Facility's Violations of the NPDES Permit's Effluent Limitations

#### *Temperature*

192.    Defendants have discharged effluent in violation of the NPDES Permit's maximum daily temperature limitation of 87 degrees Fahrenheit at least 10 times between July 2018 and July 2023, as detailed in the table below.

| Par. No. | Pollutant Criteria | Monitoring Period End Date | Outfall | Permit Limit | Measured Value |
|---|---|---|---|---|---|
| 193 | Temperature | 7/31/2018 | 003-A | 87ºF Maximum Daily | 170ºF |
| 194 | Temperature | 6/30/2020 | 003-A | 87ºF Maximum Daily | 91.4ºF |
| 195 | Temperature | 7/31/2020 | 003-A | 87ºF Maximum Daily | 87.58ºF |
| 196 | Temperature | 8/31/2020 | 003-A | 87ºF Maximum Daily | 87.85ºF |
| 197 | Temperature | 9/30/2020 | 003-A | 87ºF Maximum Daily | 88.44ºF |
| 198 | Temperature | 5/31/2022 | 003-A | 87ºF Maximum Daily | 90ºF |
| 199 | Temperature | 6/30/2022 | 003-A | 87ºF Maximum Daily | 87.1ºF |
| 200 | Temperature | 9/30/2022 | 003-A | 87ºF Maximum Daily | 97.662ºF |
| 201 | Temperature | 5/31/2023 | 003-A | 87ºF Maximum Daily | 91.36ºF |
| 202 | Temperature | 06/30/2023 | 003-A | 87ºF Maximum Daily | 90.3ºF |

203.     Fish, insects, and other aquatic species all have specific temperature ranges necessary for their survival. As temperature shifts outside a species' required range, individuals of the species die. Increases in water temperatures can lead to an increase in pathogens, nutrients, algal blooms, rates of water evaporation, and invasive species.

### Flow Rate

204.     On at least one occasion in July 2018, Twin Rivers exceeded the effluent limitation for flow rate in violation of Section I.A.2 of the NPDES Permit by discharging effluent with a flow rate of 90.18 MGD.

205.     On at least one occasion in August 2019, Twin Rivers exceeded the effluent limitation for flow rate in violation of Section I.A.2 of the NPDES Permit by discharging effluent with a flow rate of 5.612 MGD.

206.     Increased flow rate leads to increased effluent flow. This causes a greater number of fish and other aquatic life to be sucked into the Facility (entrained) or trapped against the Facility's mesh intake screen (impinged). Trapped organisms suffer. Eggs, larvae, and small invertebrates drawn into the Facility through the intake screen mesh are killed from the physical stress from mechanical pumps and high temperatures. Larger organisms, such as fish, can become trapped against the intake screen, where they can lose scales, asphyxiate, and starve.

### Oil and Grease

207.     On at least one occasion in March 2019, Twin Rivers exceeded the effluent limitation for oil and grease by over 500 percent in violation of Section I.A.1 of the NPDES Permit by discharging 85 mg/l.

208.     Oil and grease includes vegetable oils and animal fats. They can produce rancid odors, form toxic products, and harm aquatic life and wildlife. When oil and grease coat animals and

plants, they can suffer oxygen depletion, ultimately leading to suffocation. Coated animals and plants can also suffer from hypothermia, dehydration, diarrhea, and starvation.

**The Facility's Violations of the NPDES Permit's Prohibition Against Violating State Surface Water Quality Standards**

209.    On numerous occasions, Defendants have discharged, and continue to discharge, pollutants (including but not limited to oil and grease, thermal pollution, nitrogen, and zinc)  that, among other things, 1) impair any use of the Town River Bay and Weymouth Fore River; 2) are aesthetically objectionable; 3) harm aquatic life; 4) adversely affect the bottom of the Town River Bay and Weymouth Fore River; and 5) are toxic to humans, aquatic life, or wildlife.

210.    On at least 8 occasions between July 2018 and July 2023, Defendants have discharged effluent that exceeds 85 degrees Fahrenheit.

211.    The discharge of such pollutants causes or contributes to violations of the state surface water quality standards referenced in paragraphs 83-86, in violation of Section I.A.3.a of the NPDES Permit.

**The Facility's Violations of the NPDES Permit's Narrative Effluent Limitations**

212.    On numerous occasions, Twin Rivers has discharged, and continues to discharge, pollutants (including but not limited to oil and grease, thermal pollution, nitrogen, and zinc)  that, among other things: 1) cause objectionable discoloration; 2) contain oil sheen, foam, or floating solids; 3) impair designated uses of the Town River Bay and the Weymouth Fore River; 4) are hazardous or toxic to human health and aquatic life; and 5) lower the classification of the Town River Bay and the Weymouth Fore River.

213.    The discharge of such pollutants violates the narrative effluent limitations referenced in paragraphs 87-91, in violation of Sections I.A.3.c-f of the NPDES Permit.

**The Facility's Violations of the NPDES Permit's Requirement to Make Necessary Modifications to BMPs and Control Measures in its Stormwater Pollution Prevention Plan**

*Zinc*

214.    Over the last five years, Twin Rivers has exceeded the four-quarter average pollutant benchmark values for zinc at least 14 times as shown in the below table.

| Par. No. | Pollutant | Date Corrective Action Triggered | Outfall | Benchmark | Annual Average |
|---|---|---|---|---|---|
| 215 | Zinc | 9/30/2018 | 001-A | 0.095 mg/l | 0.1471 mg/l |
| 216 | Zinc | 12/31/2018 | 001-A | 0.095 mg/l | 0.150 mg/l |
| 217 | Zinc | 03/31/2019 | 001-A | 0.095 mg/l | 0.2027 mg/l |
| 218 | Zinc | 06/30/2019 | 001-A | 0.095 mg/l | 0.1977 mg/l |
| 219 | Zinc | 09/30/2019 | 001-A | 0.095 mg/l | 0.2065 mg/l |
| 220 | Zinc | 12/31/2019 | 001-A | 0.095 mg/l | 0.202 mg/l |
| 221 | Zinc | 03/31/2020 | 001-A | 0.095 mg/l | 0.1058 mg/l |
| 222 | Zinc | 06/30/2020 | 001-A | 0.095 mg/l | 0.1178 mg/l |
| 223 | Zinc | 09/30/2020 | 001-A | 0.095 mg/l | 0.096 mg/l |
| 224 | Zinc | 12/31/2020 | 001-A | 0.095 mg/l | 0.096 mg/l |
| 225 | Zinc | 03/30/2021 | 001-A | 0.095 mg/l | 0.18 mg/l |
| 226 | Zinc | 03/30/2022 | 001-A | 0.095 mg/1 | 0.1923 mg/l |
| 227 | Zinc | 06/30/2022 | 001-A | 0.095 mg/l | 0.1985 mg/l |
| 228 | Zinc | 09/30/2022 | 001-A | 0.095 mg/l | 0.9968 mg/l |

229.    Upon information and belief, Twin Rivers has neither reviewed nor made necessary modifications to its BMPs and control measures following exceedances of the four-quarter average pollutant benchmark values for zinc, in violation of Section I.B.6 of the NPDES Permit.

230.    When ingested, zinc can cause health problems in humans, including brain damage, infertility and developmental issues, pancreatic damage, anemia, nausea, vomiting, and stomach cramps. When present at high levels, zinc is toxic to humans and aquatic organisms. Zinc bioaccumulates in animals and reacts with chemicals like cadmium to intensify their toxicity.

*Nitrogen*

231.   Over the last five years, Twin Rivers has exceeded the four-quarter average pollutant benchmark values for nitrogen at least 13 times as detailed in the table below.

| Par. No. | Pollutant | Date Corrective Action Triggered | Outfall | Benchmark Value | Running Four Quarter Average |
|---|---|---|---|---|---|
| 232 | Nitrogen | 09/30/2018 | 001-A | 0.68 mg/l | 2.525 mg/l |
| 233 | Nitrogen | 12/31/2018 | 001-A | 0.68 mg/l | 2.28 mg/l |
| 234 | Nitrogen | 03/30/2019 | 001-A | 0.68 mg/l | 1.605 mg/l |
| 235 | Nitrogen | 06/30/2019 | 001-A | 0.68 mg/l | 1.33 mg/l |
| 236 | Nitrogen | 09/30/2019 | 001-A | 0.68 mg/l | 7.78 mg/l |
| 237 | Nitrogen | 12/31/2019 | 001-A | 0.68 mg/l | 8.575 mg/l |
| 238 | Nitrogen | 03/30/2020 | 001-A | 0.68 mg/l | 8.25 mg/l |
| 239 | Nitrogen | 06/30/2020 | 001-A | 0.68 mg/l | 8.575 mg/l |
| 240 | Nitrogen | 09/30/2020 | 001-A | 0/68 mg/l | 2.5 mg/l |
| 241 | Nitrogen | 12/31/2020 | 001-A | 0.68 mg/l | 2.5 mg/l |
| 242 | Nitrogen | 03/30/2021 | 001-A | 0.68 mg/l | 2.53 mg/l |
| 243 | Nitrogen | 06/30/2021 | 001-A | 0.68 mg/l | 2.23 mg/l |
| 244 | Nitrogen | 09/30/2021 | 001-A | 0.68 mg/l | 1.34 mg/l |

245.   Upon information and belief, Twin Rivers has neither reviewed nor made necessary modifications to its BMPs and control measures following exceedances of the four-quarter average pollutant benchmark values for nitrogen, in violation of Section I.B.6 of the NPDES Permit.

246.   Excess nitrogen in aquatic ecosystems contributes to eutrophication and harmful algal outbreaks. Eutrophication is a toxic and lethal process that occurs when a waterbody is over-enriched with nutrients like nitrogen and phosphorus. Eutrophication results in harmful algal blooms and oxygen-reduced areas known as "dead zones." Dead zones are areas that once flourished with marine life and are now "dead," vacant of marine life due to the lack of oxygen.

**The Facility's Violations of the NPDES Permit's Temperature Monitoring and Reporting Requirements**

247.    Upon information and belief, Twin Rivers has neither collected temperature readings from the Town River Bay nor submitted the results of such temperature monitoring to EPA and MassDEP, in violation of Section 1.E.1. and Section 1.E.2 of the NPDES Permit.

## THE FACILITY'S VIOLATIONS OF THE CLEAN AIR ACT

**The Facility's Violations of the Title V Permit and Plan Approvals' Emissions Limitations and Operational Requirements**

### *Carbon Monoxide*

248.    On at least one occasion in August 2018, Twin Rivers exceeded the emission limitation for Carbon Monoxide (CO) at EU5 by .08 pounds per hour in violation of Section 4A of the October 2015 Plan Approval.

249.    Carbon monoxide is a colorless, odorless gas that is released during incomplete burning of products containing carbon.

250.    Breathing in high concentrations of CO negatively impacts human health by decreasing the amount of oxygen in the bloodstream available for the heart and brain. Exposure to elevated levels of CO is especially dangerous for people suffering from heart disease.

### *Nitrogen oxides*

251.    On at least one occasion in 2019, Twin Rivers exceeded the emission limitation for NOx at EU5 by .16 pounds in violation of Section 4A of its October 2015 Plan Approval.

252.    Nitrogen oxides are a family of poisonous, highly reactive gases that includes nitrogen dioxide ($NO_2$). Nitrogen oxides are formed when fuel is burned at high temperatures.

253.    Short term exposure to $NO_2$ can aggravate asthma and other respiratory diseases, while long term exposure can cause asthma and increase susceptibility to respiratory infection.

*Volatile Organic Compounds*

254.    On at least the dates listed below, Twin Rivers exceeded the emission limit for VOCs in

violation of Section 3A of the June 2015 Plan Approval:

| Par. No. | Pollutant | Date Of Exceedance | Exceedance Amount | Emission Unit |
|---|---|---|---|---|
| 255 | VOC | 7/4/2018 | Unknown or unreported | EU4 |
| 256 | VOC | 8/7/2018 | .40 lbs./hr. | EU4 |
| 257 | VOC | 8/8/2018 | Unknown or unreported | EU4 |
| 258 | VOC | 10/6/2018 | 7.22 lbs./hr. | EU4 |
| 259 | VOC | 12/13/2018 | .068 lbs./hr. | EU4 |
| 260 | VOC | 12/13/2018 | .068 lbs./hr. | EU4 |
| 261 | VOC | 12/18/2018 | Unknown or unreported | EU4 |
| 262 | VOC | 1/13/3019 | .8 lbs./hr. | EU4 |
| 263 | VOC | 1/14/2019 | .8 lbs./hr. | EU4 |
| 264 | VOC | 1/15/2019 | .8 lbs./hr. | EU4 |
| 265 | VOC | 2/2/2019 | .06 lbs./hr. | EU4 |
| 266 | VOC | 2/27/2019 | .44 lbs./hr. | EU4 |
| 267 | VOC | 2/28/2019 | .03 lbs./hr. | EU4 |
| 268 | VOC | 3/5/2019 | .03 lbs./hr. | EU4 |
| 269 | VOC | 3/9/2019 | .24 lbs./hr. | EU4 |
| 270 | VOC | 3/16/2019 | .125 lbs./hr. | EU4 |
| 271 | VOC | 3/16/2019 | .125 lbs./hr. | EU4 |
| 272 | VOC | 4/9/2019 | .07 lbs./hr. | EU4 |
| 273 | VOC | 4/15/2019 | Unknown or unreported | EU4 |
| 274 | VOC | 4/16/2019 | .10 lbs./hr. | EU4 |
| 275 | VOC | 5/5/2019 | .03 lbs./hr. | EU4 |
| 276 | VOC | 5/12/2019 | .17 lbs./hr. | EU4 |
| 277 | VOC | 5/12/2019 | .17 lbs.hr. | EU4 |
| 278 | VOC | 5/13/2019 | .17 lbs./hr. | EU4 |
| 279 | VOC | 5/27/2019 | .07 lbs./hr. | EU4 |
| 280 | VOC | 5/31/2019 | Unknown or unreported | EU4 |
| 281 | VOC | 6/14/2019 | 19.87 lbs./hr. | EU4 |
| 282 | VOC | 7/6/2019 | Unknown or unreported | EU4 |
| 283 | VOC | 8/25/2019 | .41 lbs./hr. | EU4 |
| 284 | VOC | 9/5/2019 | .07 lbs./hr. | EU4 |
| 285 | VOC | 9/5/2019 | .07 lbs./hr. | EU4 |

| 286 | VOC | 9/10/2019 | .07 lbs./hr. | EU4 |
|-----|-----|-----------|--------------|-----|
| 287 | VOC | 9/19/2019 | .07 lbs./hr. | EU4 |
| 288 | VOC | 9/21/2019 | .10 lbs./hr. | EU4 |
| 289 | VOC | 9/24/2019 | Unknown or unreported | EU4 |
| 290 | VOC | 12/3/2019 | .49 lbs./hr. | EU4 |
| 291 | VOC | 1/9/2020 | .38 lbs./hr. | EU4 |
| 292 | VOC | 6/19/2020 | Unknown or unreported | EU4 |
| 293 | VOC | 12/6/2020 | .23 lbs./hr. | EU4 |
| 294 | VOC | 12/17/2020 | Unknown or unreported | EU4 |
| 295 | VOC | 1/4/2021 | 17.93 lbs./hr. | EU4 |
| 296 | VOC | 3/2/2021 | .2 lbs./hr. | EU4 |
| 297 | VOC | 4/12/2021 | 1.09 lbs./hr. | EU4 |
| 298 | VOC | 7/12/2021 | 78.23 lbs./hr. | EU4 |
| 299 | VOC | 10/9/2021 | .81 lbs./hr. | EU4 |
| 300 | VOC | 10/28/2021 | 10.05 lbs./hr. | EU4 |
| 301 | VOC | 11/9/2021 | 2.99 lbs./hr. | EU4 |
| 302 | VOC | 1/8/2022 | Unknown or unreported | EU4 |
| 303 | VOC | 1/9/2022 | 6.88 lbs./hr. | EU4 |
| 304 | VOC | 7/5/2022 | Unknown or unreported | EU4 |
| 305 | VOC | 8/15/2022 | .62 lbs./hr. | EU4 |
| 306 | VOC | 8/18/2022 | 1.86 lbs./hr. | EU4 |
| 307 | VOC | 8/24/2022 | .61 lbs./hr. | EU4 |
| 308 | VOC | 8/30/2022 | Unknown or unreported | EU4 |
| 309 | VOC | 9/4/2022 | .34 lbs./hr. | EU4 |
| 310 | VOC | 9/5/2022 | .1 lbs./hr. | EU4 |
| 311 | VOC | 9/9/2022 | .1 lbs./hr. | EU4 |
| 312 | VOC | 9/13/2022 | .1 lbs./hr. | EU4 |
| 313 | VOC | 2/18/2023 | .75 lbs./hr. | EU4 |
| 314 | VOC | 2/25/2023 | .017 lbs./hr. | EU4 |
| 315 | VOC | 3/28/2023 | .27 lbs./hr. | EU4 |

316.    On at least one occasion in November 2022, Twin Rivers violated the 97 percent by weight VOC destruction efficiency requirement in Section 3A of the June 2015 Plan Approval when it measured a VOC destruction efficiency of 85.2 percent.

317.    On at least one occasion in 2023, Twin Rivers violated the 95 percent by weight VOC

control efficiency standard in Section 3A of the June 2015 Plan Approval and/or the 85 percent by weight VOC control efficiency in Section 4A of the Title V Permit.

318.    Volatile organic compounds can be emitted as gases resulting from chemical processes and can react with other gases to form other air pollutants in the atmosphere after they are emitted.

319.    VOCs are very harmful to human health, causing difficulty breathing and nausea, and eye, nose, and throat irritation. VOCs also cause damage to the central nervous system and organs in the body, and some VOCs cause cancer.

**The Facility's Violations of its Emissions Compliance Testing**

320.    On at least one occasion in June 2022 and one occasion in the first quarter of 2023, Twin Rivers failed its emissions compliance testing for PCD2, in violation of Section 4B of its Title V Permit.

**The Facility's Violations of the Prohibition on Causing or Contributing to a Condition of Air Pollution**

321.    On at least the following dates, citizen complaints submitted to MassDEP or site visits have documented noise and/or odors coming from the Facility:

| Par. No. | Pollutant Complained About | Date Of Complaint | Source of Information |
|---|---|---|---|
| 322 | Odor | 2/5/2019 | Complaint submitted to MassDEP |
| 323 | Odor | 5/14/2019 | Complaint submitted to MassDEP |
| 324 | Odor | 6/14/2019 | Complaint submitted to MassDEP |
| 325 | Odor | 6/23/2019 | Complaint submitted to MassDEP |
| 326 | Odor | 11/16/2020 | Complaint submitted to MassDEP |
| 327 | Odor | 7/31/2021 | Complaint submitted to MassDEP |
| 328 | Odor/noise | 2/15/2023 | Site visit |

329.    On at least the dates listed in paragraphs 322-328, Twin Rivers violated Section 5 of its Title V Permit, Section 4B of its June 2015 Plan Approval, and Section 4B of is October 2015 Plan Approval by "causing or contributing to a condition of air pollution."

**The Facility's Failure to Comply with the Title V Permit and Plan Approvals' Requirement
to Immediately Take Appropriate Steps to Abate Nuisance Conditions**

330.    Communications with community members, site visits, and public records, confirm that

Twin Rivers has created nuisance conditions by permitting emissions which cause or contribute

to odor and/or noise.

331.    Twin Rivers has not taken appropriate steps to abate the nuisance conditions of odor

and/or noise from its Facility.

332.    By failing to take appropriate steps to abate the nuisance conditions of odor and/or noise

from its Facility, Twin Rivers has repeatedly violated, and is continuing to violate, Section 5 of

the Title V Permit, Section 5A of the June 2015 Plan Approval, and Section 6.1 of the October

2015 Plan Approval.

## THE FACILITY'S HARMS TO CLF MEMBERS

**Clean Water Act Violations**

333.    CLF members use the Town River Bay and Weymouth Fore River for aesthetic and

recreational enjoyment and observing wildlife.

334.    CLF members cherish the Town River Bay and Weymouth Fore River as places of natural

importance, historical interest, and/or personal significance.

335.    CLF members enjoy the experience of sharing the recreational and aesthetic values of the

Town River Bay and Weymouth Fore River with family and friends.

336.    The Facility's discharges of pollutants into the Town River Bay and Weymouth Fore

River have degraded the health of the waterbodies and contributed to their impairments in a way

that diminishes the use and enjoyment of the waterbodies by CLF members.

337.    CLF members are concerned about the health impacts of pollution from direct contact

with waters downstream from the Facility.

338.    CLF members worry about the potential health effects of being exposed to oil and grease, heavy metals, and other pollutants in the Town River Bay and Weymouth Fore River.

339.    CLF members worry about the negative impact of oil and grease, heavy metals, and other pollutants on their ability to enjoy observing wildlife on the Town River Bay and Weymouth Fore River.

340.    The presence of odor, unnatural color, scum, foam, and diminished water clarity adversely affect the aesthetic enjoyment of the Town River Bay and Weymouth Fore River by CLF members.

341.    The actual and threatened harm to CLF's members would be redressed by a declaration, injunction, civil penalty, and other relief that prevents or deters future violations of the Facility's NPDES Permit, and that requires Defendants to offset their pollution from these violations by reducing its pollution, or otherwise remediating harm that has already been caused to CLF members and their local communities.

**Clean Air Act Violations**

342.    CLF members live, rent, own property, work, study, attend school, use transit, and/or spend time shopping, recreating, and conducting activities near the Twin Rivers Facility. CLF members seek to continue to use areas in the neighborhood of and around the Facility for these and other purposes.

343.    CLF members reside in and around Quincy and Weymouth, Massachusetts.

344.    As of the filing of this complaint, at least seven citizen complaints (including some filed by CLF members) have been made to MassDEP about airborne odors, noise, and pollutants coming from the Facility.

345.    CLF members experience noxious odors emitted from the Facility.

346.    CLF members can see air pollution coming from the Facility.

347.    CLF members inhale and are otherwise exposed to the pollutants emitted by the Facility.

348.    CLF members experience difficulty breathing, and/or suffer from other respiratory symptoms.

349.    CLF members have been prevented from going outside because of air pollution emitted from the Facility.

350.    CLF members have considered selling their houses because of air pollution emitted from the Facility.

351.    CLF members believe that the conditions and symptoms described in paragraphs 344-350 are caused by the Facility's air emissions and violations based on: the proximity of the Facility to their homes or to the places where they experience these impacts; the wind direction at the time they experience these impacts; and the distinctive odors emanating from the Facility.

352.    The pollutants the Facility emitted during the alleged violations cause the types of symptoms and conditions CLF members have experienced.

353.    CLF members are reasonably concerned about inhaling carcinogens and other pollutants emitted by the Facility.

354.    CLF members are reasonably concerned that pollutants released from the Facility have harmed, and will continue to harm and threaten their health, well-being, quality of life, and enjoyment, as well as those of their families.

355.    CLF members want to breathe as little air pollution from the Facility as possible and do not want to breathe illegally emitted air pollutants.

356.    CLF members' abilities to live, raise their families, work, recreate, and conduct other activities in the neighborhood of and around the Facility have been impaired, harmed, limited,

and/or prevented by the Defendants' violations.

357.    The actual and threatened harm to CLF members would be redressed by a declaration, injunction, civil penalty, and other relief that prevents or deters future violations of the Facility's Title V Permit and Plan Approvals, and that requires Defendants to offset their pollution from these violations by reducing their pollution, or otherwise remediating harm that has already been caused to CLF members and their local communities.

## CLAIMS FOR RELIEF

### Clean Water Act Violations

### Count I: Temperature Violations

358.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

359.    Defendants have discharged effluent in violation of the NPDES Permit's maximum daily temperature limitation of 87 degrees Fahrenheit at least 10 times between July 2018 and July 2023.

360.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the NPDES Permit in the future unless enjoined from doing so.

361.    Each day that Defendants have violated, or continue to violate, the NPDES Permit's effluent limitation for temperature is a separate and distinct violation of the NPDES Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### Count II: Flow Rate Violations

362.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

363.    On at least one occasion in July 2018 and one occasion in August 2019, Twin Rivers exceeded the effluent limitation for flow rate in violation of Section I.A.2 of the NPDES Permit.

364.    Each day that Defendants have violated, or continue to violate, the NPDES Permit's effluent limitation for flow rate is a separate and distinct violation of the NPDES Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## Count III: Oil and Grease Violations

365.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

366.    On at least one occasion in March 2019, Twin Rivers exceeded the effluent limitation for oil and grease in violation of Section I.A.1 of the NPDES Permit.

367.    Each day that Defendants have violated, or continue to violate, the NPDES Permit's effluent limitation for oil and grease is a separate and distinct violation of the NPDES Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## Count IV: Violations of the Prohibition Against Violating State Surface Water Quality Standards

368.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

369.    Defendants have discharged, and continue to discharge, pollutants (including but not limited to oil and grease, thermal pollution, nitrogen, and zinc) that cause or contribute to the violation of the surface water quality standards referenced above in paragraphs 83-86 in violation of Section I.A.3.a of the NPDES Permit.

370.    Every state surface water quality standard violation constitutes a separate and distinct violation of the NPDES Permit.

371.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate these provisions of the NPDES Permit in the future unless enjoined from doing so.

372.    Each day, and for each pollutant parameter, each state surface water quality standard that Defendants have violated, or continue to violate, and each assigned use Defendants have

interfered with constitutes a separate and distinct violation of the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## Count V: Violations of the Narrative Effluent Limitations

373.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

374.    Upon information and belief, Twin Rivers has violated the narrative effluent limitations referenced above in paragraphs 87-91 in violation of Sections I.A.3.c-f.

375.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate these provisions of the NPDES Permit in the future unless and until enjoined from doing so.

376.    Each day, and for each pollutant parameter, that Defendants have violated, or continue to violate, the NPDES Permit's narrative effluent limitations is a separate and distinct violation of the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## Count VI: Violations of the Requirement to Make Necessary Modifications to BMPs and Control Measures in the Stormwater Pollution Prevention Plan

377.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

378.    Upon information and belief, Twin Rivers has neither reviewed nor made necessary modifications to its BMPs and control measures following exceedances of the four-quarter average pollutant benchmark values for nitrogen and zinc, in violation of Section I.B.6 of the NPDES Permit.

379.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate Section I.B.6. of the NPDES Permit in the future unless and until enjoined from doing so.

380.     Each day that Defendants have violated, or continue to violate, the BMP or stormwater control requirements is a separate and distinct violation of the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### Count VII: Violations of the Temperature Monitoring and Reporting Requirements

381.     Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

382.     Upon information and belief, Twin Rivers has neither collected temperature readings from the Town River Bay nor submitted the results of such temperature monitoring to EPA and MassDEP, in violation of Section I.E.1. and Section I.E.2. of the NPDES Permit.

383.     In light of Defendants' history of violations, Defendants will continue to violate these provisions of the NPDES Permit in the future unless and until enjoined from doing so.

384.     Each day that Defendants have violated, or continue to violate, the temperature monitoring and reporting requirement is a separate and distinct violation of the NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**<u>Clean Air Act Violations</u>**

### Count VIII: Carbon Monoxide Violations

385.     Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

386.     On at least one occasion in August 2018, Twin Rivers exceeded the emission limitation for CO at EU5 in violation of Section 4A of the October 2015 Plan Approval.

387.     By exceeding the emission limitation for CO in violation of Section 4A of the October 2015 Plan Approval, Defendants have violated the Massachusetts State Implementation Plan and the Clean Air Act.

### Count IX: Nitrogen Oxide Violations

388.     Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

389.    On at least one occasion in 2019, Twin Rivers exceeded the emission limitation for NOx at EU5 in violation of Section 4A of its October 2015 Plan Approval.

390.    By exceeding the emission limitation for NOx at EU5 in violation of Section 4A of its October 2015 Plan Approval, Defendants have violated the Massachusetts State Implementation Plan and the Clean Air Act.

### Count X: Volatile Organic Compounds Violations

391.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

392.    On at least 61 occasions, Twin Rivers exceeded the emission limit for VOCs in violation of Section 3A of the June 2015 Plan Approval.

393.    On at least one occasion in November 2022, Twin Rivers violated the 97 percent by weight VOC destruction efficiency requirement in Section 3A of the June 2015 Plan Approval.

394.    On at least one occasion in 2023, Twin Rivers violated the 95 percent by weight VOC control efficiency standard in Section 3A of the June 2015 Plan Approval and/or the 85 percent by weight VOC control efficiency by weight in Section 4A of the Title V Permit.

395.    By exceeding the emission limitation for VOCs in violation of Section 3A of the June 2015 Plan Approval, Defendants violated the Massachusetts State Implementation Plan and the Clean Air Act.

396.    By violating the 97 percent by weight VOC destruction efficiency requirement in Section 3A of the June 2015 Plan Approval, Defendants violated the Massachusetts State Implementation Plan and the Clean Air Act.

397.    By violating the control efficiency standard in Section 3A of the June 2015 Plan Approval and/or the Title V Permit, Defendants have violated the Massachusetts State Implementation Plan and the Clean Air Act.

**Count XI: Violations of the Emissions Compliance Testing**

398.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

399.    On at least one occasion in June 2022 and one occasion in the first quarter of 2023, Twin Rivers failed its biennial emissions compliance testing for PCD2, in violation of Section 4B of its Title V Permit.

400.    By failing their emissions compliance testing in violation of Section 4B of their Title V Permit, Defendants have violated the Massachusetts State Implementation Plan and the Clean Air Act.

**Count XII: Violations of the Prohibition on Causing or Contributing to a Condition of Air Pollution**

401.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

402.    On at least eight (8) occasions, citizen complaints submitted to MassDEP or site visits have documented noise and/or odors coming from the Facility, in violation of Section 5 of Defendants' Title V Permit, Section 4B of their June 2015 Plan Approval, and Section 4B of their October 2015 Plan Approval.

403.    By violating Section 5 of their Title V Permit, Section 4B of their June 2015 Plan Approval, and Section 4B of their October 2015 Plan Approval, Defendants have violated the Massachusetts State Implementation Plan and the Clean Air Act.

**Count XIII: Violations of the Requirement to Immediately Take Appropriate Steps to Abate Nuisance Conditions**

404.    Paragraphs 1 through 357 are incorporated by reference as if fully set forth herein.

405.    Twin Rivers has repeatedly violated, and is continuing to violate, Section 5 of the Title V Permit, Section 5A of the June 2015 Plan Approval, and Section 6.1 of the October 2015 Plan Approval by failing to take appropriate steps to abate the nuisance conditions of odor and/or noise from its Facility.

406.    By violating Section 5 of their Title V Permit, Section 5A of their June 2015 Plan

Approval, and Section 6.1 of their October 2015 Plan Approval, Defendants have violated the

Massachusetts State Implementation Plan and the Clean Air Act.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court grant the following relief:

a.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendants have

violated, and remain in violation of, the NPDES Permit, Section 301(a) of the Clean

Water Act, 33 U.S.C § 1311(a), and applicable regulations, as alleged in Counts I, II, III,

IV, V, VI, and VII of this Complaint;

b.    Issue a declaratory judgment, pursuant to 42 U.S.C. § 7604(a), that Defendants

have repeatedly violated, and remain in violation of, the Title V Permit, the June 2015

Plan Approval, the October 2015 Plan Approval, the Massachusetts State Implementation

Plan, Section 304(a) of the Clean Air Act, and applicable regulations, as alleged in

Counts VIII, IX, X, XI, XII, XIII;

c.    Enjoin Defendants from violating the requirements of the NPDES Permits,

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and applicable Clean Water

Act regulations;

d.    Enjoin Defendants from violating the requirements of the Title V Permit, the June

2015 Plan Approval, the October 2015 Plan Approval, the Massachusetts State

Implementation Plan, Section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), and

applicable Clean Air Act regulations;

e.    Impose civil penalties on Defendants of up to $64,618 per day per violation for all

violations occurring after November 2, 2015, and where penalties are assessed on or after

January 6, 2023, pursuant to Sections 505(a) and 309(d) of the Clean Water Act, 33

U.S.C. §§ 1365(a) and 1319(d), and its implementing regulations of 40 C.F.R. § 19.4;

f.        Impose civil penalties on Defendants of up to $117,468 per day per violation for

all violations occurring after November 2, 2015, where penalties are assessed on or after

January 6, 2023, pursuant to Sections 113(b) and 304 of the Clean Air Act, 42 U.S.C. §§

7413(b), 7604(a), and its implementing regulations of 40 C.F.R. §§ 19.1–19.4;

g.        Award Plaintiff's costs of litigation, including reasonable attorney and expert

witness fees, as provided under Section 505(a) of the Clean Water Act, 33 U.S.C. §

1365(d), and Section 304 of the Clean Air Act, 42 U.S.C. § 7604(d), and

h.        Grant such other relief as this Court may deem appropriate.


Dated: August 14, 2023                              Respectfully submitted,


                                                    /s/ _Erica Kyzmir-McKeon_____
                                                    Erica Kyzmir-McKeon, Esq.
                                                    *Pro hac vice motion to be filed*
                                                    Clare Soria, Esq.
                                                    Massachusetts Bar No. 711648
                                                    Heather A. Govern, Esq.
                                                    Massachusetts Bar No. 688482
                                                    Conservation Law Foundation, Inc.
                                                    62 Summer St.
                                                    Boston, MA 02110
                                                    (617) 850-1763
                                                    ekyzmir-mckeon@clf.org

                                                    ATTORNEYS FOR PLAINTIFF